In re Carolyn JACOBS, Debtor.

Carolyn Jacobs, Objector,

v.

Vineyards Condominium Association, Inc., Respondent.

No. 04–68654–PWB.

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

April 28, 2005.

Susan H. Shiptenko, Michael Rethinger, Law Office of Matthew T. Berry, Atlanta, GA, for Debtor.

Julie Howard, Weissman, Nowack, Curry & Wilco, P.C., Atlanta, GA, for Vineyards Condominium Association, Inc.

## OPINION ON OBJECTION TO PROOF OF CLAIM OF VINEYARDS CONDOMINIUM ASSOCIATION, INC.

PAUL W. BONAPFEL, Bankruptcy Judge.

After Carolyn Jacobs, the debtor in this Chapter 13 case (the "Debtor"), purchased her condominium unit in January 2002, she failed to make the first three monthly condominium assessment payments of $187 each because she erroneously thought they were included in her mortgage payment. Vineyards Condominium Association, Inc. (the "Association") sued her in May for the entire year's assessment and obtained a default judgment in July for $2,424.50, which included costs and attorney's fees of $394.50.

After the suit was filed and judgment was entered, the Debtor continued to make substantially all of her monthly assessment payments, occasionally paying more in an effort to catch up on her missed payments. In the meantime, the Association pursued generally unsuccessful post-judgment remedies until April 2004, when it garnished her wages. The Debtor then filed her Chapter 13 petition on May 27, 2004.

The Association's proof of claim for unpaid assessments includes $4,132.95 for additional attorney's fees and expenses pursuant to O.C.G.A. § 44–3–109(b), which authorizes a condominium association to recover "reasonable attorney's fees actually incurred" in connection with collection of an assessment. The Debtor objected to the attorney's fees and expenses, and the Court conducted an evidentiary hearing. For reasons set forth below, the Court concludes that only $2,127.25 of the additional attorney's fees and expenses is allowable as "reasonable attorney's fees actually incurred."

The Debtor's objection did not contest the amount of her liability on the judgment and for other pre-petition charges, but the evidence at the hearing raised concerns about these issues. The Court at the end of this opinion will prescribe procedures to address these disputes.

I.

The Association's right to recover attorney's fees and litigation expenses is governed by O.C.G.A. § 44–3–109(b)(3):

To the extent that the condominium instruments provide, the personal obligation of the unit owner and the lien for assessments shall also include:

(3) The costs of collection, including court costs, the expenses of sale, any expenses required for the protection and preservation of the unit, and reasonable attorney's fees actually incurred.

The condominium instruments permit recovery of attorney's fees and expenses, and the Association actually incurred them. The issue is whether they are "reasonable."

In support of its claim, the Association submitted an itemized statement of services provided by its attorneys and of expenses incurred. The following chart summarizes the fees and expenses during three separate stages of the representation:

| Stage of Representation | Fees | Expenses | |
|---|---|---|---|
| Pre–Judgment (4/22/02–7/1/02) | $ 613.00 | Title Examination | $ 75.00 |
| | | Court Costs | 80.00 |
| | | Copy Expense | 2.00 |
| | | Total | $ 157.00 |
| Post–Judgment and Pre–Bankruptcy (9/5/02–5/14/03) | $1,546.00 | Court Costs | $ 352.00 |
| | | Post–Judgment Deposition | 231.50 |
| | | Equifax | 25.00 |
| | | Private Investigator | 550.00 |
| | | Copy Expense | .20 |
| | | Total | $1,158.70 |
| Post–Bankruptcy | $ 980.00 | Pacer | 25.00 |
| | | Courier | 30.21 |
| | | Parking & Mileage | 14.54 |
| | | Copy Expense | 3.00 |
| | | Total | $ 72.75 |
| Totals | $3,139.00 | | $1,388.45 |

The statement thus shows fees of $3,139 and expenses of $1,388.45 for a total of $4,527.45. Because the default judgment included attorney's fees of $314.50 and costs of $80, the claim is reduced by $394.50 to $4,132.95.[1]

The proof of claim also includes an additional fee of $343 for filing the proof of claim. The Debtor does not challenge this charge.

The Association contends that the services of its attorneys were necessary for it to collect from the Debtor, that the time spent in providing required services was reasonable, that the hourly rates are fair, and that the expenses were necessarily incurred in connection with the representation. The Debtor does not dispute that time was actually spent as represented, that the time spent was appropriate to perform the services that the lawyers provided, or that the hourly rates are fair. Rather, she contends that the Association did not need to engage counsel to collect assessments that she admittedly owed, paid in part, and intended to pay in full. Because the legal services were not necessary, she asserts, the charges for them are not reasonable.

II.

The Debtor bought her condominium unit in January 2002. The assessment on the unit was then $178 per month.

The Court infers that the seller paid the assessment for January and that the charge was pro-rated at closing.[2] For reasons explained below, the Debtor failed to

1. *See* Affidavit of Julie M. Howard ¶ 6, attached to Motion to Reconsider Order [Docket No. 34]. There are two itemized statements before the Court. One, attached to counsel's affidavit, shows a total of $4,132.95, the amount claimed in the proof of claim. The other, Exhibit 2, introduced as evidence at the hearing, shows a total of $4,157.95. The difference appears to be an additional $25 Pacer charge on August 4, 2004. The Court will limit the Association to the amounts set forth in the proof of claim. (The Association's motion requested the Court to vacate an order disallowing the fees and expenses that the Court had entered after a hearing at which the Association did not appear. Because counsel had not received proper notice of the objection or the hearing, the Court granted the motion, resulting in the consideration of the dispute on the merits.)

2. The principal amount of the judgment was $1,987.50, which is only $29.50 more than 11 payments of $178. If the January assessment had not been paid, the principal amount would presumably be for 12 payments, or $2,136.

make payments for February, March, and April. Based on these defaults, the Association declared assessments for the remainder of the year immediately due and payable, sued the Debtor, and obtained a default judgment on July 20, 2002, for $2,424.54, consisting of $1,987.50 principal, prejudgment interest of $42.54, attorney's fees of $314.50, and court costs of $80.00.

The Debtor missed the initial payments because she had been advised that her monthly mortgage payment included an amount for the monthly condominium assessment that the lender would pay on her behalf, similar to an escrow arrangement for ad valorem taxes and insurance that is common in real estate mortgages. When the Association demanded payment, she contacted the mortgage broker who had arranged the financing and the lender to find out why the lender was not making payments. She eventually learned that the monthly mortgage payment did not include an amount for the assessments and that she would have to pay them. Because she did not have enough monthly income to start paying monthly assessments immediately and remain current on her 15 year mortgage, she sought and obtained a modification of her mortgage that reduced the monthly payment by increasing the amortization period to 30 years. After the mortgage payment was reduced, she began making monthly assessment payments.

The Debtor testified, without contradiction, that she made her first monthly assessment payment in June 2002 for the month of May, and that thereafter she made monthly payments for June, August, September, October, and December, 2002. She missed the July payment. Her check for the November payment bounced because the Association had garnished her bank account, which had a balance of $234.44. In 2002, then, the Debtor made six payments of $178, for a total of $1,068.

For the year 2003, the assessment remained at $178 per month, a total of $2,136 for the year. During 2003, the Debtor paid a total of $2,488, $352 more than that year's assessment.

The monthly assessment went up to $208 in 2004. For the prepetition period from January to May 2004, the amount due was $1,040, and the Debtor paid $1,050. The Debtor has remained current since the filing of her petition on May 27, 2004.

The Debtor's prepetition payments thus totaled $4,840.44, calculated as follows: (1) Six payments of $178 each in 2002, $1,068; (2) $234.44 from her garnished bank account; (3) twelve payments of varying amounts in 2003, $2,488; (4) five payments of varying amounts in 2004, $1,050.

The Association's accounting for prepetition payments shows total payments, including the garnishment, of $3,952.44. It appears that the Association applied the payment for December 2002 to the January 2003 payment, applied a $500 payment in February to the judgment rather than to current assessments, and charged $80 in late fees in 2002. The Association also charged a $10 late fee in February 2004.

On an unaccelerated basis, and without regard to interest, late charges, costs, and attorney's fees, the Debtor's total liability for assessments for the prepetition period is $5,163.50: $1,987.50 for 2002, $2,136 for 2003, and $1,040 for January through May 2004. She testified she paid $4,840.44—all but $234.44 from the garnished bank account voluntarily, and $178 of that would have been paid voluntarily but for the garnishment.

While the Debtor was making all these payments that were less than $325 short of the payments due on an unaccelerated basis, the Association's lawyers were pursuing legal remedies. The Association re-

408

ferred the Debtor's case to its attorneys in April 2002, and they filed and served the lawsuit against the Debtor in May.

The Debtor contacted the Association's property manager on a couple of occasions to explain her situation. The property manager responded that the Debtor would have to discuss the problem with the Association. The Debtor did not do so, nor did she respond to the lawsuit.

Because the Debtor did not answer the complaint, the Association obtained a default judgment for the entire year's unpaid assessment, interest, costs, and attorney's fees. The attorneys then pursued post-judgment collection efforts. They garnished her bank account in October 2002, recovering $234.44, as described above. They attempted to garnish the same account in April 2003, but the account by then had been closed. In March 2004 they filed a wage garnishment, but the garnishee responded that the Debtor's employment had been terminated in 1997.

The attorneys next took the Debtor's post-judgment deposition, at which she was evasive and uncooperative. She unjustifiably refused to answer questions about where she worked, where she had a bank account, or who financed her car, by improperly invoking the Fifth Amendment privilege against self-incrimination. Counsel then employed a private investigator, who discovered where the Debtor worked, and filed a wage garnishment against her employer in April 2004.

The Debtor filed her Chapter 13 case on May 27, 2004. At that time, the Debtor's mortgage and car finance payments were current, and she had only three unsecured consumer debts in the manageable amount of $3,610. (Debtor's schedules D and F [Docket No. 1] ). The bankruptcy filing increased the difficulty for everyone to be paid, because the Debtor incurred $2,000 for her Chapter 13 lawyer's fees. (FED. R.

BANKR.P. 2016 Disclosure Statement [Docket No. 1] ).

At the time the bankruptcy case was filed, the Association's use of legal process had resulted in the collection of $234.44 in one successful garnishment that prevented it from getting $178 from the Debtor's check that bounced. The fees and expenses incurred prior to the bankruptcy for the attorneys to obtain the default judgment, to file four garnishment actions, and to investigate the Debtor totaled $3,474.70. The Association thus spent $3,474.70 to collect $56.44 more than it would have received if it had done nothing.

After the bankruptcy filing, the Association incurred further legal fees of $980 and expenses of $72.75, in addition to a charge of $343 for the preparation and filing of its proof of claim. The bankruptcy services consist, for the most part, of work to oppose the Debtor's motion to avoid the Association's judgment lien pursuant to 11 U.S.C. § 522(f), which the Debtor ultimately withdrew. Regrettably, the Debtor did not withdraw it until it was called for hearing—after the Association's counsel had spent two hours (at $200 per hour) waiting to be heard.

III.

Under O.C.G.A. § 44-3-109(b)(3) and the condominium declaration, the Association is entitled to "reasonable attorney's fees actually incurred."

Whether attorney's fees are reasonable under this statute is a question of fact. *Wehunt v. Wren's Cross of Atlanta Condominium Assoc., Inc.,* 175 Ga.App. 70, 332 S.E.2d 368 (1985). The limitations on attorney's fees set forth in O.C.G.A. § 13-1-11(a), which specifies that attorney's fees be awarded on a percentage basis of the amount due, are inapplicable to the recovery of attorney's fees under

the condominium statute. *Id.* Moreover, as *Wehunt* illustrates, the award of attorney's fees is not necessarily limited by the amount in controversy. In that case, the court awarded $9,000 in fees to the association in connection with extensive litigation to collect an assessment of $980.14.

■ A reasonable fee is not established merely on the basis of the amount billed by the attorney. *Hershiser v. Yorkshire Condominium Assoc., Inc.,* 201 Ga. App. 185, 410 S.E.2d 455 (1991). The issue is the *value* of the services, not their cost. *See id., citing First Bank of Clayton County v. Dollar,* 159 Ga.App. 815, 285 S.E.2d 203 (1981); *Hub Motor Co. v. Zurawski,* 157 Ga.App. 850, 278 S.E.2d 689 (1981). Attorney's fees have no value if legal services are unnecessary or ineffective.

■ The fact that the Association could lawfully exercise its legal remedies after the Debtor's default does not automatically mean that their exercise was necessary or that attorney's fees incurred in doing so are "reasonable attorney's fees actually incurred" within the meaning of § 44-3-109(b)(3). Of course, a client *may* pursue any available legal remedies and spend whatever it wants in doing so. But in the context of a statute that conditions the shift of that cost to the other side on its reasonableness, the client must establish that it had proper objectives, that its choice of legal remedies was reasonably necessary to accomplish them, and that the expense of doing so was justifiably incurred in view of the amount involved and the reasonably anticipated results. A prudent client who must pay its own expenses will engage in a cost-benefit analysis to determine whether the anticipated benefits of pursuing legal remedies are worth the probable cost and will seek less expensive alternatives, if available. The same cost-benefit analysis governs whether legal expenses are reasonable so that they may be shifted to the adversary.

■ The conduct of the adversary is also a relevant consideration. As *Wehunt* illustrates, a unit owner who forces an association to incur legal costs dramatically out of proportion to the amount involved in unsuccessful litigation to avoid liability must pay the expenses that the conduct made necessary. Moreover, because it is vitally important to each unit owner that all pay their assessments—because otherwise the paying owners must make up the shortfall—an association must have some leeway in aggressively collecting assessments.

The Court's analysis of the reasonableness of the Association's legal costs begins with the startling fact that post-judgment, prepetition legal services costing $3,474.70 increased its receipts by only $56.44. The fees and expenses are more than five times the missed payments that led to the judgment and exceed even the amount of the judgment itself. There is a serious disparity between the fees charged, on the one hand, and the amount involved and results achieved on the other. And unlike the situation in *Wehunt,* the huge variance is not explained by litigiousness on the part of the Debtor. She did nothing to oppose the legal processes employed by the Association.

The grossly disproportionate legal costs arise from the utter failure of either side to communicate with the other. Other than the Debtor's futile effort to discuss the matter with the Association's property manager and perhaps some off the record discussions at her post-judgment deposition, there is no evidence that the parties made any effort to communicate outside of the legal process.

The Association and the Debtor were like two ships passing in the night. The

law firm kept plugging away with enforcement efforts designed to put pressure on the Debtor. The Debtor blithely and inexplicably ignored the legal processes that were swirling around her but continued to make payments that she presumably thought were reducing her debt. Nor did the conduct of either party have any noticeable effect on the other. The Association's use of legal process did not make the Debtor stop paying or pay more; her payments never caused the Association to think about anything except the next collection effort.

Arguably, the Association's decision to plow forward with collection activity worked to its disadvantage by making it more difficult for the Debtor to pay. In this regard, continuing collection activity that increases the amount of a debt by more than the recovery becomes ultimately self-defeating by making it impossible or economically senseless for a unit owner of modest means and income to pay.

The Debtor's situation here illustrates the point. The undisputed evidence is that her condominium unit is worth only approximately $84,320 and that the mortgage balance is approximately $89,000. A review of Debtor's schedules indicates that she could convert to chapter 7, move, reaffirm her car debt, and discharge the assessment and credit card debt. At some point, it makes no economic sense for a unit owner to attempt to satisfy a junior encumbrance on a residence when its value does not even cover the first mortgage. Adding on attorney's fees obviously makes the prospect of abandonment of the unit to foreclosure—and of the Association thus collecting nothing—more likely.

The parties collectively, aided and abetted by their lawyers, have managed to turn a potentially solvable problem of relatively modest proportions into a huge and costly mess. They transformed a $564 problem—three months payments (or a $742 problem if the missed July payment is also included)—into a claim (taking into account legal costs, interest, late charges, and the unpaid principal balance of the judgment as asserted by the Association) for $6,486.88. The Debtor's own legal fees for her chapter 13 case exceed the amount of payments that she missed.

The Debtor and the Association have incurred legal fees and expenses between them of $6,527.45 [3] to resolve a problem that began with an innocent mistake by the Debtor with a magnitude of $742, measured by the four monthly payments the Debtor missed. This makes no sense.

It is disheartening, to say the least, that there is no evidence that a lawyer in this case ever heeded Abraham Lincoln's advice to lawyers:

> Discourage litigation. Persuade your neighbors to compromise whenever you can. Point out to them how the nominal winner is often a real loser—in fees, expenses, and waste of time.

This case poses a dilemma. The Association incurred far more fees and expenses than necessary in an ill-considered and ineffective effort to collect. For her part, the Debtor foolishly failed to pursue communication with the Association or its attorneys and then ignored, and at her deposition abused, legal process. Both sides are unjustifiably at fault.

■ The solution to the dilemma is to determine, for each stage of the representation, what legal services were reasonably necessary and justifiably incurred in an effort to accomplish the Association's proper objective of payment, taking into ac-

---

**3.** The amount is the sum of $394.50 awarded in the Association's judgment, $4,132.95 asserted in its proof of claim, and $2,000 for the Debtor's chapter 13 lawyer.

count the amount involved, reasonably anticipated results, and the extent to which the Debtor's conduct made legal services necessary.

■ The Association's decision to sue the Debtor and obtain a default judgment was clearly appropriate. She moved in and immediately defaulted for three months. She made no effort to pursue communication with the Association or the attorneys beyond contact with the property manager, even after the filing of the lawsuit should have alerted her to the fact that something was terribly wrong. The Association is entitled to attorney's fees and expenses for services through obtaining the default judgment. The amount, however, will be limited to the $394.50 awarded by the State Court. No additional fees are permissible for this stage of the representation based on principles of *res judicata*.

The Debtor's continuing payment of ongoing condominium assessments and her effort to reduce the amount of her past-due obligations showed an intent to pay. In view of this, and in the absence of evidence of any serious effort by an Association representative or its lawyers to at least attempt some non-judicial communication with the Debtor or collection outside of legal process, the Court concludes that the Association has failed to show that it was necessary to pursue post-judgment collection remedies as it did.

Counsel at the hearing indicated that the economic circumstances of unit owners at this condominium are generally modest, at best. The Court cannot find from the evidence that there was a reasonable possibility that garnishments of a bank account or wages would produce any significant recoveries. Indeed, it is predictable in many cases that a wage garnishment will result in a bankruptcy filing. Garnishments could, of course, be a rational (and only) choice if a unit owner continued to default or moved away. But the pursuit of garnishments without any effort to communicate with the Debtor or to collect by alternative means was not an appropriate choice in the circumstances presented. To the contrary, the course the Association chose to pursue was actually counterproductive and could not have been justified by a reasonable cost-benefit analysis at the time.

Given the expense of legal proceedings, the Debtor's continued payments, and a common sense understanding of the probable financial circumstances of unit owners of modest means (*i.e.*, that bank accounts are not likely to be plentiful and that garnished wages may likely result in bankruptcy), the absence of any serious effort by the Association to communicate with the Debtor in an effort to increase or systemize the flow of payments is inexplicable. The Association's own self-interest should have prompted someone to wonder why it was spending hundreds and eventually thousands of dollars to collect from someone *who kept on paying*. The continuing use of legal process not only decreased the Association's current cash flow; it also, as explained above, had the very real potential of resulting in no collection at all—and a vacant unit, to boot.

At the least, some sort of cost-benefit analysis was called for, and other alternatives should have been considered, before the Association continued incurring fees and expenses dramatically out of proportion to the amount involved. There is no evidence of either. These circumstances indicate that the legal services cannot be justified as necessary and that the charges for them, therefore, are not reasonable.

At the same time, the Debtor's conduct contributed to the Association's incurring post-judgment legal fees. She totally ig-

nored legal process, and she herself failed to initiate contact to try to work out a payment plan. Such conduct might be excusable in that she might have assumed—however naively—that her payments that included small reductions in her liability were acceptable in the absence of further communication from the Association until the post-judgment deposition and successful wage garnishment.

But there are no mitigating considerations that justify or excuse the Debtor's behavior at her post-judgment deposition. For all the reasons discussed above, the deposition was no more necessary than the garnishments. Once it began, however, the Debtor had no right to withhold information to which the Association was legally entitled with a totally unjustified invocation of a non-existent Fifth Amendment privilege. Moreover, such conduct could reasonably have led the Association to conclude that, contrary to her assertions, the Debtor was trying to evade her obligations.

■ Given that it was appropriate for the Association to file the complaint and to obtain default judgment, it was also appropriate for the Association to have post-judgment representation. The Court concludes that $500 for post-judgment, pre-bankruptcy legal services is reasonable. The $25 Equifax charge was also necessary and is reasonable. The garnishments were not necessary, nor was the post-judgment deposition. The fees and expenses in connection with those matters are, therefore, not reasonable.

■ Beyond this, the Association was also entitled to information that the Debtor improperly refused to provide at her deposition. Although the Association did not need to conduct a post-judgment deposition, once it did so the Debtor had a duty to provide legally appropriate testimony. When she did not, it became appropriate for the Association to seek that information by alternative means. Accordingly, the expense of $550 for the private investigator is a reasonable expense because the Debtor's conduct made it necessary.

■ With regard to post-bankruptcy fees and expenses incurred by the Association in connection with the Debtor's motion to avoid the judgment lien, the Debtor is similarly responsible. There was an obvious solution to the issue: The lien is avoidable as a judicial lien under 11 U.S.C. § 522(f) with regard to any exempt property other than the condominium unit, but the Association's statutory lien on the unit itself by virtue of O.C.G.A. § 44–3–109(a) is not avoidable under § 522(f). The capable and experienced counsel on both sides could have and should have resolved this issue with a consent order at minimal expense. Instead, the Debtor withdrew the motion, but only after the Association's counsel was required to file a response, to prepare for a hearing, and to wait two hours for the matter to be called.

In these circumstances, the Association is entitled to fees of $300 and expenses for Pacer services of $25 as reasonable fees and expenses for dealing with the lien avoidance issue and $680 in fees and the remaining bankruptcy expenses of $47.75 as reasonable fees and expenses necessitated by the Debtor's conduct in postpetition litigation. Counsel for the Debtor is directed to consult with the Debtor and the Chapter 13 Trustee to determine whether counsel's fees should be reduced to account for his contribution to this problem. Debtor's counsel shall file a statement within 15 days stating the amount, if any, by which counsel's fees will be voluntarily reduced and whether either the Debtor or the Chapter 13 Trustee contends that any further reduction is warranted.

In summary, the Court finds that the "reasonable attorney's fees actually incurred" to which the Association is entitled (in addition to the $314.50 in fees and $80.00 in costs awarded by the State Court, which has been paid) is $2,127.75, calculated as follows: (1) For post-judgment, prebankruptcy services, $500 for fees and $575.00 for expenses; and (2) for bankruptcy services, $980 for fees and $72.75 for expenses. The Association is also entitled to $343.00 as a reasonable fee for services in connection with filing its proof of claim, because no objection has been made.

## IV.

The Debtor's current objection does not contest anything claimed by the Association except attorney's fees. The evidence at the hearing, however, indicates that the Association may not have accurately accounted for the Debtor's payments or determined her liabilities, which it has a duty to do under O.C.G.A. § 44–3–106(d) and § 44–3–109(d). It is appropriate in the interest of judicial economy to establish a procedure for the resolution of these issues.

The Debtor showed that she made payments from inception through May 2004 in the amount of $4,840.44. The Association's accounting shows total payments of $3,952.44. There is, therefore, a discrepancy of $888.

This amount is about the same as five payments the Debtor testified she made in 2002 that do not appear to be reflected in the Association's accounting. In this regard, the Association's accounting shows no payments from the Debtor in 2002, but she testified she made six. A possible explanation for the one payment difference is that the Association may have recorded a December 2002 payment in January 2003; the accounting shows payment in January 2003 of $358, whereas the Debtor claims to have paid only $178 that month. Counsel for the Association at the hearing also suggested an explanation for two payments in May and June totaling $356: that they had been applied to attorney's fees. Neither a charge for attorney's fees nor their payment is reflected on any documentation before the Court. Moreover, this explanation is inconsistent with counsel's explanation of the charges for attorney's fees set forth in her affidavit [4] and with the itemized billing statement that the Association advanced as an accurate representation of all fees charged.

If the Debtor has made $888 in payments that have not been applied, there should be a reduction in the principal amount of her liability. Furthermore, proper application of the payments could reduce interest or eliminate late charges.

There are other concerns about the Association's accounting. There is a late charge of $10 in February 2003 even though the accounting shows the double payment in January 2003 that would have covered the February payment. Moreover, the Debtor paid $500 in February 2003, presumably intending that it cover her February payment and also reduce her liability for 2002. The Association applied the entire payment to the judgment liability. Such application may have resulted in more late fees.

In view of these concerns and the statutory accounting obligations of the Association, the Court directs the Association to file an amended proof of claim within 30 days and to attach an accounting showing the dates and amounts of all charges and payments made with regard to Debtor's assessments for the period from inception through May 31, 2004. A copy shall be

**4.** *See* note 1, *supra.*

served on counsel for Debtor. The Debtor may then file a further objection, if warranted, to put in issue the amount properly due and owing.

It is appropriate that all issues relating to the Association's proof of claim be resolved at the same time. Thus, although this Order will constitute the Court's findings of fact and conclusions of law with regard to the Association's claim for attorney's fees, the Court will defer entry of a final judgment on the issues, as required by FED. R. BANKR.P. 9021, for 60 days. If, within that time, the Debtor has filed a further objection to the Association's claim as amended, the Court will schedule a hearing on the objection, determine the issues raised thereby, and enter a judgment on all issues. If no further objection is filed within that time, the Court will enter a final judgment disallowing attorney's fees to the extent set forth herein. If the parties timely file a stipulation resolving all remaining issues, their agreement will be incorporated into a final judgment.